**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DANIEL TILBE,**

                **Plaintiff,**

        **v.**                              **5:10-CV-910**
                                        **(NAM/ATB)**

**MICHAEL J. ASTRUE,**
**COMMISSIONER OF SOCIAL SECURITY,**

               **Defendant.**
_____

**APPEARANCES:**                                **OF COUNSEL:**

Olinsky & Shurtliff                       Howard D. Olinsky, Esq.
300 South State Street
Suite 520
Syracuse, New York 13202
_For Plaintiff_

Peter W. Jewitt                           Katrina Lederer,
Social Security Administration           Special Assistant U.S. Attorney
Office of Regional General Counsel
Region II
26 Federal Plaza - Room 3904
New York, New York 10278
_For Commissioner_

**Hon. Norman A. Mordue, U.S. District Judge**

**MEMORANDUM DECISION AND ORDER**

**I.**       **INTRODUCTION**

      Plaintiff Daniel Tilbe brings this action under the Social Security Act, 42 U.S.C. §§ 405(g)

and 1383(c)(3), seeking judicial review of the decision by defendant Michael J. Astrue,

Commissioner of Social Security, to deny his application for supplemental security income

benefits ("SSI") and disability insurance benefits ("DIB").  Plaintiff alleges that he has been

disabled since February 1, 2005, due to bilateral carpal tunnel syndrome, asthma, obesity,

borderline intellectual functioning with reading disorder, lumbar radiculopathy, shoulder

impingement syndrome, and sleep apnea.  Administrative Transcript "T." at 86-95.

On October 23, 2006, plaintiff filed an application benefits under the Social Security Act.

Following an initial denial of his application, T. 51-52, plaintiff requested a hearing before an

Administrative Law Judge ("ALJ").  T. 61-62.  On December 15, 2008, ALJ Michael Devlin held

a hearing.  T. 20-50.  Plaintiff appeared at the hearing with his attorney.  T. 20.  On February 19,

2009, the ALJ issued a decision denying plaintiff's application.  T. 10.  On July 16, 2010, the

Appeals Council denied plaintiff's request for review making the ALJ's decision the

Commissioner's final determination.  T. 1-5.  Plaintiff filed this action on July 26, 2010.

This matter was referred to United States Magistrate Judge Andrew T. Baxter for a Report

and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(d).  Magistrate

Judge Baxter recommended that this Court enter judgment on the pleadings affirming the

Commissioner's decision denying disability benefits and dismissing plaintiff's claims.  Presently

before the Court are plaintiff's objections to the Report and Recommendation.

## II.    BACKGROUND

Magistrate Judge Baxter included a thorough summary of the medical evidence, non-

medical evidence, and hearing testimony.  The Court incorporates this summary, to which there is

no objection, here:

> MEDICAL EVIDENCE
> A. Anna Marie Ward, M.D.
>         The earliest medical report in this case is from physician Anna Marie Ward,
> who treated plaintiff from May 11, 2005 until July 3, 2006.  (T. 178-91). On May 11,
> 2005, approximately three months after plaintiff claims that he became disabled, Dr.
> Ward treated him for wrist pain. (T. 190-91). Dr. Ward stated that plaintiff had always

had neck pain from a "prior accident." (T. 190). She found good range of motion and reflexes in the left shoulder, but with some tenderness. Id. She also diagnosed carpal tunnel syndrome on the left side. (T. 191). On January 23, 2006, Dr. Ward stated that plaintiff was having breathing problems at night, and in February, she scheduled a sleep study for March. (T. 184, 186). On May 31, 2006, Dr. Ward noted that plaintiff had pain in his left hand, carpal tunnel syndrome, and trigger fingers. (T. 181).

B. Hospital Records

On February 10, 2006, plaintiff was admitted to Chenango Memorial Hospital, stating that, the day before, he woke up on the floor at the bottom of the cellar stairs. (T. 166). Plaintiff stated that he had no recollection of what happened, and his injuries consisted of a sore lump on his head with a small abrasion, a sore back, and a sore abdomen. (T. 166). His examination showed a contusion and small abrasion in the parietal area of the scalp, some tenderness in the periumbilical area of the low back, and some tingling in the right leg and foot, on light touch. (T. 166-67). A CT scan of plaintiff's brain was normal, and an x-ray of plaintiff's lumbosacral spine showed no acute changes. (T. 167). His EKG showed sinus bradycardia with questionable left ventricular hypertrophy and questionable anterior infarct of undetermined age. (T. 167). His strength and motion were normal. (T. 169). He was discharged from the hospital the following day on his usual diet and "activity as tolerated." (T. 167). He was given Vicodin for pain, and he resumed his Lisinopril,[FN3:  Lisinopril is a medication used to treat high blood pressure. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000917/] and albuterol inhaler. Id.

Dr. Anthony Chicoria saw plaintiff about his wrist on August 16, 2006. (T. 192-93). An EMG study showed that plaintiff had significant carpal tunnel syndrome, for which plaintiff had surgery on August 24, 2006. (T. 192-96). The operative report showed that there was severe nerve compression on the left side, but the release was successful. (T. 193, 196). In addition to the carpal tunnel release, the doctor performed a release of the A1 pulley of the third and fourth fingers. (T. 193).

C. Dr. Kalyani Ganesh

On December 1, 2006, Dr. Kalyani Ganesh conducted an internal medicine consultative examination. (T. 203-210). Plaintiff's diagnoses were sleep apnea, status post left carpal tunnel surgery, and hypertension. (T. 206). Dr. Ganesh noted that plaintiff had left carpal tunnel surgery and would likely need to have surgery on the right side because he was still experiencing some numbness and pain. (T. 203). Plaintiff was five feet, six inches tall and weighed 326 pounds. (T. 204). Plaintiff was able to walk on his toes, but not his heels and could squat only 50 percent. (T. 204). His gait and stance were normal, and he did not use any assistive devices. *Id*. He needed no help changing for the examination, getting on and off the examination table, and was able to rise from his chair without difficulty. *Id*.

A musculoskeletal examination of the cervical spine showed full flexion, full extension, lateral flexion of 25 degrees bilaterally, and full rotary movement bilaterally. (T. 205). There was no scoliosis, kyphosis, or abnormality of the thoracic spine. *Id*. The lumbar spine showed full flexion, extension, lateral flexion, and full rotary movement bilaterally. *Id*. Straight leg raising was negative on both sides, and

3

there was full range of motion of the shoulders, elbows, forearms and wrists on both sides. *Id.* Plaintiff also had full range of motion in his hips, knees, and ankles. Strength was 5/5 in his upper and lower extremities, and there were no evident subluxations, contractures, ankylosis or thickening. His joints were stable and nontender. *Id.*

Biceps and triceps reflexes were absent, and his ankle jerks were absent, but patellar reflexes were normal, and no motor or sensory deficit was noted. (T. 205). His hand and finger dexterity were intact, and his grip strength was 5/5 bilaterally. Dr. Ganesh stated that muscle atrophy was not "evident." (T. 205). Spirometry testing was normal, and the doctor noted that plaintiff put forth "little" effort. Id. Dr. Ganesh's conclusion was that plaintiff's prognosis was "fair," and that there were "no gross physical limitation . . . to sitting, standing, walking, or use of upper extremities." (T. 206).

D. Dennis M. Noia, Ph.D.

On the same day as Dr. Ganesh's examination, plaintiff also underwent a consultative "Intelligence Evaluation" by Dennis Noia, Ph.D. (T. 198-202). Dr. Noia conducted various tests. (T. 200). The intelligence test results indicated that plaintiff had a Verbal Scale IQ of 77, a Performance Scale IQ of 72, and a Full Scale IQ of 72. (T. 200). Overall, plaintiff was functioning in the borderline range of intelligence. *Id.* Plaintiff's reading tests showed that he read at a second grade equivalent, and that this was significantly lower that his overall level of intellectual functioning, suggesting the presence of a reading disorder. *Id.*

Dr. Noia concluded that vocationally, the plaintiff appeared to be capable of understanding and following simple instructions and directions. (T. 201). He also concluded that plaintiff would be able to perform simple and some complex tasks with supervision and independently. (T. 201). He was capable of maintaining attention and concentration for tasks as well as being able to regularly attend to a routine and maintain a schedule. *Id.* He appeared to be capable of learning new tasks and making appropriate decisions. *Id.* He appeared to be capable of dealing with stress and to be able to interact "moderately well" with others. *Id.* Dr. Noia concluded that the results of the examination were "consistent with borderline intellectual functioning and a reading disorder." (T. 201).

E. Dr. Steven A. Levine, D.O.

Plaintiff was treated for his sleep apnea by Dr. Levine. On April 14, 2008, plaintiff was admitted to the Mohawk Valley Sleep Disorders Center for a consultation. (T. 241-43). He was tested on May 12, 2008 with a continuous positive airway pressure (CPAP) machine. (T. 244-50). The CPAP machine eliminated the obstructive sleep apnea syndrome with "significant improvement in sleep quality," and plaintiff reporting that his sleep was "'much better than average.'" (T. 245). In June of 2008, Dr. Levine reported that plaintiff's sleep apnea syndrome was eliminated with the CPAP machine and was "currently . . . doing extraordinarily well." (T. 239) (emphasis added). At that time, plaintiff had also stopped smoking and was considering bariatric surgery for his morbid obesity. *Id.*

F. Michael Walsh, M.D. [FN4: Some of the reports refer to Michael Walsh, M.D., and

other reports refer to Michael Walsh, D.O. (*Compare* T. 264 *with* T. 301).]

After the ALJ hearing, plaintiff's counsel submitted some additional medical records that became part of the administrative transcript. (T. 260-340). Dr. Walsh began seeing this plaintiff in February of 2008 (T. 335-40), and saw him every three to five months. (T. 261). Plaintiff was examined on June 2, 2008. (T. 305-08). In that report, Dr. Walsh stated that there were "positive impingement signs bilaterally" and straight leg raising was positive on the left. (T. 307). He "added" the diagnosis of left shoulder impingement syndrome and lumbar radiculopathy. (T. 307). In the comments section of his June 2 report, Dr. Walsh stated that plaintiff was morbidly obese, and had degenerative spinal changes with limited functional capacity. He recommended physical therapy for his left shoulder. (T. 307).

In a "functional capacity" evaluation, also dated June 2, 2008, Dr. Walsh found that plaintiff could lift ten pounds occasionally; stand or walk two hours per day; and sit for less than six hours per day. (T. 267). Dr. Walsh checked boxes indicating "abnormal" on various abilities, including repetitive stooping and bending for long periods; remaining seated for long periods; crouching or squatting; and climbing. (T. 267). However, the doctor checked boxes indicating "normal" as to all mental abilities, including understanding, carrying out and remembering instructions; responding to co-workers; meeting quality standards and production norms; and sustaining adequate attendance. *Id*. Plaintiff's manipulative abilities were also considered "normal." *Id*.

In a report, dated October 8, 2008, plaintiff's "chief complaint" was listed as "disability paperwork." (T. 298). Dr. Walsh stated that plaintiff reported pain from the lumbar spine radiating to his left lower extremity and the lateral aspect of his lower leg. (T. 298). Plaintiff stated that he felt this pain intermittently to the level of his right knee also. Id. The doctor noted that plaintiff "had an MRI completed several years ago" which showed "herniation at L5-S1." *Id.* There was no chest pain or shortness of breath, and no sensory loss reported. *Id.* An examination showed positive straight leg raising bilaterally, but normal gait. (T. 300). The examination also showed diminished sensation to pinprick in his feet, but his strength was symmetric. (T. 300).

In an RFC evaluation, dated October 8, 2008, Dr. Walsh stated that plaintiff could sit, stand, and walk 1-2 hours. (T. 304). The same RFC evaluation stated that plaintiff could not lift, carry, push, pull, bend, or squat "in any capacity." *Id.* He had no limitations hearing, speaking, or using his hands. *Id.* All mental abilities were intact, except for the ability to maintain basic standards of personal grooming, which the doctor found that plaintiff was able to do with some limitations (2-4 hours). *Id.*

In his December 15, 2008 RFC evaluation, Dr. Walsh listed the following diagnoses: diabetes mellitus; obstructive sleep apnea; morbid obesity; and left lumbar radiculopathy. (T. 261). Due to these impairments, Dr. Walsh stated that plaintiff had a variety of symptoms. (T. 261). These symptoms included fatigue, difficulty walking, excessive thirst, swelling, muscle weakness, extremity pain and numbness, and dizziness or loss of balance. *Id.* In paragraph 6, entitled "Clinical Findings," Dr. Walsh wrote that plaintiff had decreased strength in his left hand and required an assistive device for "ambulation steadiness." *Id.*

Dr. Walsh concluded that plaintiff's impairments would frequently interfere with the concentration and attention needed to perform even simple work tasks, but he could tolerate "moderate work stress." (T. 262). Dr. Walsh stated that plaintiff could sit for less than two hours total in an 8-hour work day; could walk less than one block; could only sit ten minutes at a time; could only stand fifteen minutes at a time, and must walk "around" every fifteen minutes for two minutes. (T. 263). Plaintiff would need to shift positions "at will" and would have to take unspecified unscheduled breaks during the day. *Id.* On his unscheduled breaks, plaintiff would have to sit quietly for fifteen minutes before returning to work.

Dr. Walsh also concluded that plaintiff could lift and carry ten pounds, could rarely twist or stoop, and could never crouch, squat, or climb. (T. 263-64). The doctor did find that plaintiff would have no significant limitations reaching, handling, or fingering. (T. 264). However, the doctor then stated that plaintiff could only use his hands 50% of the time for grasping, turning or twisting objects; 70% of the time for fine manipulations; and could only use his arms 20% of the time for reaching. (T. 264). Finally, Dr. Walsh stated that plaintiff's impairments were likely to produce "good days" and "bad days," and that, based on this estimate, plaintiff would have to be out of work about "three days per month." *Id.*

G. Kenneth Graniero, M.D.

On June 11, 2008, plaintiff had a bariatric surgery consultation with Dr. Kenneth Graniero, M.D. (T. 276-78). In an examination, plaintiff "**denie[d]**" back pain, joint pain, joint swelling, muscle cramps, muscle weakness, stiffness or arthritis, paralysis, weakness, paresthesias, syncope, vertigo, and a variety of other symptoms. (T. 276) (emphasis added). A[] physical examination showed full range of motion, no instability, and no weakness in any part of the body. (T. 277). A neurologic assessment showed no focal deficits, deep tendon reflexes were symmetric, and sensation was grossly intact. (T. 277). Dr. Graniero's psychiatric assessment showed that plaintiff's judgment and insight were "intact," he was properly oriented to time, place and person, and he remembered recent and remote events. *Id.* There was no depression, anxiety, or agitation. *Id.*

H. Physical Therapy Evaluation. Timothy T. Francisco, P.T.

On June 16, 2008, plaintiff was given a physical therapy evaluation. (T. 281-82). Plaintiff had this evaluation because he stated that he began having pain one year earlier "after a cow hit his shoulder with her head." (T. 281). The therapist wrote that plaintiff had signs of left AC (acromioclavicular) joint sprain. Id. Plaintiff had left shoulder flexion of 150 degrees and left shoulder abduction of 100 degrees. *Id*. Leftsided shoulder muscle strength upon flexion, was 4+ out of 5; 4/5 upon abduction; and 5/5 upon internal and external rotation. *Id.* Passive range of motion on the left side was 170 degrees on flexion and 135 on extension. *Id*. The therapist's plan was to have plaintiff attend therapy three times per week for eight weeks to increase range of motion and strength. *Id*.

Non-Medical Evidence and Testimony

At the time of the hearing, plaintiff was 47 years old and completed the 10th grade in school. (T. 25, 27). He testified, however, that he did not take regular classes,

but was in "special ed." (T. 27). He stated that he dropped out of school when he was 17, and that the hardest part of school was reading and writing. (T. 27). He told the judge that he did not read or write well at all. (T. 27). Plaintiff stated that, while he was in school, he took vocational training classes in "small engine repair." (T. 27). After he dropped out of school, he went to the Job Corps and was given some training in electrical work, more specifically, commercial wiring, however, he did not work in that field because he could not pass the test for his electrical license. (T. 28). He testified that while he was in the Job Corps, they did the reading and spelling for him, but when he had to take the test by himself, he could not complete it. (T. 29). Plaintiff testified that he tried to read newspaper articles, comics, and captions under pictures. (T. 48). However, he stated that he could not understand the articles, and had to have help filling out his Social Security application. *Id*.

Plaintiff testified that he became disabled on February 1, 2005 because he began having back pain, and although he attempted to work at different jobs, he could not do the paperwork. (T. 29-30). Plaintiff testified that he attempted to work at a fast food restaurant, but could not "do all the paperwork." (T. 31). He tried to do security work, but could not pass the test. (T. 31). However, he was a security guard for a period of time and a truck driver. (T. 32-34). Plaintiff claimed that he could not work as a truck driver because he could not fill out the log books. (T. 34). Plaintiff also worked as a taxi cab driver, but "couldn't get hired." (T. 34-35).

Plaintiff testified that the biggest problem keeping him out of work is his inability to sit, stand, and walk for a period of time due to his low back pain. (T. 35-36). Plaintiff stated that his treating physician is Dr. Walsh, who prescribed a cane for plaintiff. (T. 36). Plaintiff also claimed that he had trouble with his "trigger" fingers that "still lock up." (T. 37). Plaintiff stated that he had carpal tunnel syndrome on both the right and left side, and had two surgeries on the left wrist. (T. 37). The ALJ then discussed plaintiff's weight, sleep apnea, and asthma. (T. 38). Plaintiff also stated that he had some tendinitis in his elbow. (T. 38). The ALJ mentioned that plaintiff's diabetes appeared to be "fairly well controlled." (T. 39). Plaintiff also claimed that, a few years prior to the hearing, he had dizziness, lost his balance, and fell down a flight of stairs. (T. 40). Plaintiff also had some testing for his heart. (T. 40).

He was 5'7" tall, and weighed 343 pounds. (T. 25). By the time of the hearing, plaintiff was separated from his wife and lived alone in a two story, single family home. (T. 26). Plaintiff testified that he no longer used the upstairs. (T. 27). Plaintiff stated that due to his sleep apnea, he did not sleep well at night, causing him to "doze off" for 15 or 20 minutes, two or three times during the day. (T. 41). Plaintiff testified that he was taking "a whole bunch" of medication. Id. The ALJ asked whether any of the medications gave plaintiff side-effects, and plaintiff stated that one of the medications caused increased necessity to urinate so that he would have to have "more than" typical breaks during the day to accommodate this side-effect. (T. 43).

Plaintiff complained of being uncomfortable sitting during the hearing. (T. 44). Plaintiff testified that he was uncomfortable even sitting at home in his "Lazy [sic] Boy" chair. Id. He stated that although he cooked microwave meals for himself, he used paper plates and plastic utensils because he could no longer do the dishes. *Id*. He goes grocery shopping, but uses an electric cart to get around the store. *Id*. His

sister comes to help him clean the house and do the laundry, and plaintiff hires someone to mow the lawn. (T. 45). Although plaintiff testified that he could drive, he stated that he generally only drove back and forth to the store and doctors' offices. (T. 45).

Plaintiff testified that he could only sit for 10 to 15 minutes before he had to get up and move around. (T. 46). He estimated that he could only walk one half of a city block before he had to sit down and rest. *Id*. Plaintiff also estimated that he could carry approximately 10 pounds about half way across the room. *Id*. Plaintiff stated that he "tried different weights," and that he has to use both hands to carry a gallon of milk or he will drop it. (T. 47). Plaintiff claimed that he even dropped items as light as coffee cups and pens. *Id*. He stated that he could not bend over and only wore shoes that he could "slip on." *Id*.

Report-Recommendation, Dkt. No. 15, pp.5-16.

## III.   ALJ's DECISION

To be eligible for Social Security disability benefits, a claimant must establish "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  There is a five-step analysis for evaluating disability claims:

> "In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do." The claimant bears the burden of proof on the first four steps, while the Social Security Administration bears the burden on the last step.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002)); *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000) (internal citations omitted).

In this case, the ALJ found at step one that plaintiff has not engaged in substantial gainful activity since February 1, 2005, the alleged onset date.  T. 12.

8

At step two, the ALJ found that plaintiff "has the following 'severe' impairments: bilateral carpal tunnel syndrome, asthma, obesity, and borderline intellectual functioning with reading disorder". T. 13. The ALJ also found that plaintiff's "sleep apnea, hypertension, diabetes and heart problems are not 'severe' in that they do not more than minimally affect the claimant's ability to engage in basi[c] work activities individually or in combination." T. 14.

At step three, the ALJ found that plaintiff did not "have an impairment or combination of impairments that meets or medically equals one of the listed impairments." T. 14.

Prior to step four, which requires a determination of whether the claimant can perform past relevant work, the ALJ found that plaintiff:

> has the residual functional capacity to perform the full range of sedentary work . . . except the claimant must avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and other respiratory irritants; and the claimant can perform simple and some complex tasks in a competitive work environment on a regular and continuing basis.

T. 16. The ALJ based his residual functional capacity determination on the opinions of plaintiff's treating source, Dr. Walsh, and the consultative examiner for the Administration, Dr. Ganesh. T. 17. The ALJ gave the opinions of Drs. Walsh and Ganesh "some weight". T. 17. When evaluating plaintiff's mental limitations, the ALJ gave "great weight" to the opinion of the Administration's examining psychological consultant, Dr. Noia, and "some weight" to the "non-examining review psychologist". T. 18. The ALJ found that while plaintiff's impairments "could reasonably be expected to cause" the symptoms he allegedly suffered, plaintiff's statements concerning the intensity, persistence and limiting effects" of his symptoms were not credible "to the extent they are inconsistent with" the residual functional capacity determination. T. 17.

At step four, the ALJ found that plaintiff, a former truck driver, could not "perform any

past relevant work."  T. 18.

At step five, the ALJ considered plaintiff's age, education, work experience, and residual functional capacity and concluded that because plaintiff's limitations did not "significantly erode the sedentary occupational base", Medication-Vocational Rule 201.25 and 201.19 directed a "finding of 'not disabled'".  T. 19.

## IV.    REPORT-RECOMMENDATION

The Magistrate Judge found: (1) the ALJ's determination, at step two, that plaintiff's lumbar radiculopathy, shoulder impingement syndrome, and sleep apnea were not "severe" impairments, was supported by substantial evidence; (2) the ALJ did not err in failing to find that plaintiff's impairments met Listing 1.04; (3) the ALJ's decision to accord the opinion of plaintiff's treating physician, Dr. Walsh, "some weight", is supported by substantial evidence; (4) the ALJ's residual functional capacity determination is supported by substantial evidence; (5) the ALJ's credibility finding is supported by substantial evidence; and (6) the ALJ properly relied on the Medical-Vocational Guidelines; a vocational expert was not required.  Plaintiff objects to every aspect of the Report-Recommendation.

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court engages in a *de novo* review of any part of a Magistrate's Report and Recommendation to which a party specifically objects.  Failure to object to any portion of a Magistrate's Report and Recommendation operates as a waiver of further judicial review of those matters.  *See Roland v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993); *Small v. Sec. of Health & Human Servs*., 892 F.2d 15, 16 (2d Cir. 1989).

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether plaintiff is disabled.  Rather, the Court must examine the

10

administrative transcript to ascertain whether the correct legal standards were applied, and

whether the decision is supported by substantial evidence. *See Shaw*, 221 F.3d at 131; *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Curry v. Apfel*, 209 F.3d 117, 122 (2d Cir. 2000) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks and citation omitted). An ALJ is obligated to develop the record regardless of whether claimant is represented by counsel. *See Shaw*, 221 F.3d at 131.

## V.      DISCUSSION

### A.      Step Two - Severe Impairment

Plaintiff argues that the Magistrate Judge applied the wrong standard when evaluating whether the record supported plaintiff's claims that his back, shoulder, and sleep apnea are severe impairments. Plaintiff further argues that the Magistrate Judge "cherry-picked" evidence to support his conclusion.

Plaintiff has the burden at step two in the sequential evaluation process to demonstrate the severity of his impairment. *See* 20 C.F.R. § 404.1520(c). An impairment is severe if it significantly limits physical or mental abilities to do basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c). The severity analysis at step two may do no more than screen out *de minimis* claims. *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995) (holding that it does not appear possible for an impairment to be less than "severe" but "more than slight or minimal," because "severe" includes the entire range above slight or minimal).

The ALJ found that plaintiff's carpal tunnel syndrome, asthma, obesity, and borderline intellectual functioning were "severe" impairments. The ALJ, however, found that plaintiff's

back and shoulder impairments were not severe because there were no radiological reports in the record suggesting either impairment and plaintiff specifically told Dr. Graniero that he had no back pain, joint pain, or joint swelling.  The ALJ acknowledged that plaintiff had sleep apnea but found that it was not a severe impairment because it did not affect plaintiff's ability to engage in basic work activities "more than minimally".  Even if the ALJ erred in failing to find plaintiff's back and shoulder impairments and sleep apnea, alone or in combination, to be severe impairments, such an error is harmless in this case.  The ALJ did find a number of plaintiff's conditions to be severe impairments, and proceeded to step three.  Further, notwithstanding his previous finding that these conditions were not severe, the ALJ considered their impact on plaintiff's residual functional capacity.  Accordingly, the Court finds plaintiff's objection regarding step two is without merit.

### B.    Listed Impairment

At step three, the ALJ considered whether plaintiff had an impairment or combination of impairments that met or equaled a listed impairment.  Plaintiff contends that the ALJ should have found, at step three, that his back impairment met Listing 1.04, "Disorders of the spine", and argues that the Magistrate Judge "inappropriately excused the ALJ from engaging in meaningful rationale at step 3".

"The Social Security regulations list certain impairments, any of which is sufficient, at step three, to create an irrebuttable presumption of disability." *DeChirico v. Callahan*, 134 F.3d 1177, 1180 (2d Cir. 1998) (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)).  "The regulations also provide for a finding of such a disability *per se* if an individual has an impairment that is 'equal to' a listed impairment." *Id*. (citing 20 C.F.R. 404.1520(d) ("If you have an impairment(s) which .

12

. . is listed in appendix 1 or is equal to a listed impairment(s), we will find you disabled without considering your age, education, and work experience.")).

Individuals suffering a disorder of the spine are disabled *per se* if they meet the criteria specified in the regulations.  The listing plaintiff claims the ALJ should have considered is Listing 1.04(A) which states:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine) . . . .

20 C.F.R. Pt. 404, Subpt. P., App. 1, § 1.04.

There is a reference in Dr. Walsh's report dated October 8, 2008, to a "MRI completed several years ago."  T. 298.  Dr. Walsh noted that the "[r]eport shows herniation at L5-S1."  T. 298.  As discussed in section V.D. of this Memorandum Decision and Order, that MRI is not in the record.  Even assuming, however, that plaintiff could satisfy the first element, and show disc herniation, his impairment does not meet all the specified medical criteria of Listing 1.04(A), which include: limitation of motion of the spine, motor loss, sensory or reflex loss, and positive straight-leg raising.  To qualify for benefits at step three, claimants must show that their impairments "meet all of the specified medical criteria" for the particular listing.  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). Dr. Ganesh's notes state that plaintiff's "cervical spine shows full flexion, full extension, lateral flexion 25 degrees bilaterally, and full rotary movement bilaterally."  T. 205.  "Lumbar spine shows full flexion, extension, lateral flexion bilaterally,  and

full rotary movement bilaterally."  T. 205.  Even assuming Dr. Ganesh's finding that plaintiff's

"lateral flexion 25 degrees bilaterally" met the "limitation of motion of the spine" criterion, that

Dr. Walsh's finding that plaintiff had sensory loss in his feet, met the "sensory or reflect loss"

criterion, and that Dr. Walsh's finding that plaintiff had "positive straight leg raising" met the

"positive straight-leg raising test", there is no objective evidence in the record showing "motor

loss".  Indeed the only evidence on that score is plaintiff's complaint to Dr. Walsh that "[h]e feels

like he has been having episodes lately where he feels like legs feel weak."  T. 298.  Accordingly,

any error in the ALJ's failure to consider whether plaintiff's impairment met or equaled Listing

1.04 is harmless because no view of the evidence would support a finding that plaintiff's

impairment met all the specified medical criteria of Listing 1.04.

### C.     Residual Functional Capacity

Plaintiff argues that the residual functional capacity determination is the product of legal

error because the ALJ failed to include a function by function assessment of plaintiff's mental

limitations.  Residual functional capacity is:

> "what an individual can still do despite his or her limitations . . . .
> Ordinarily, RFC is the individual's maximum remaining ability to do
> sustained work activities in an ordinary work setting on a regular and
> continuing basis, and the RFC assessment must include a discussion
> of the individual's abilities on that basis. A 'regular and continuing
> basis' means 8 hours a day, for 5 days a week, or an equivalent work
> schedule."

*Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96-8p, Policy Interpretation Ruling

Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims ("SSR 96-8p"), 1996

WL 374184, at *2 (S.S.A. July 2, 1996)).  In making a residual functional capacity determination,

the ALJ must consider a claimant's physical abilities, mental abilities, symptomology, including

14

pain and other limitations which could interfere with work activities on a regular and continuing basis.  20 C.F.R. § 404.1545(a).

With respect to a mental impairment, "[i]n the event the impairment is deemed severe, but does not meet or equal a listed mental disorder, the Commissioner next analyzes the claimant's RFC".  *White v. Comm'r of Soc. Sec.,* 2008 WL 820177, at *8 (N.D.N.Y. 2008) (citing 20 C.F.R. §§ 404.1520a(d)(3), 404.1545(c), 416.920a(d)(3), 416.945(c)).  "Use of the four broad functional categories outlined in § 416.920a to determine whether a claimant's impairments are 'severe' is not equivalent to a mental RFC assessment."  *Rosado v. Barnhart*, 290 F.Supp.2d 431, 441 (S.D.N.Y. 2003) (holding that the use of the "B" criteria to determine whether the plaintiff's impairments are "severe" is a separate and distinct step from assessing her mental RFC, which is expressed as work-related functions).  SSR 96-8p requires a more detailed assessment than the criteria used to rate the severity of mental impairments.  *Id.* (citing 20 C.F.R. Pt. 404 , Subpt. P. App. 1 § 12.00(A) (finding that the RFC assessment "complements" the "B" criteria by requiring consideration of an expanded list of work-related capacities that may be affected by mental disorders)).   If an ALJ finds that the claimant suffered from any mental impairment, "no matter how unsevere", he has the duty to take that into account when determining plaintiff's capabilities. *Gray v. Astrue*, No. 04 Civ. 3736, 2007 WL 2874049, at *7 (S.D.N.Y. Oct. 3, 2007).

When determining mental RFC, the ALJ is required to itemize various functions contained in the broad categories outlined in § 416.920a.  *See* SSR 96-8p, 1996 WL 374184, at *4.  The particular functions that must be assessed are the basic work-related mental activities specified by the regulations - such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work

15

setting-to such a degree as to reduce his or her ability to do past relevant work and other work.

*See* 20 C.F.R. §§ 404.1520a(d)(3), 404.1545(c), 416.920a(d)(3), 416.945(c); *see also White*, 2008 WL 820177, at *8; *see also Pabon v. Barnhart*, 273 F.Supp.2d 506, 516 (S.D.N.Y. 2003).

SSR 85-16 sets forth what evidence the Commissioner should consider when assessing a claimant's mental residual functional capacity, and provides:

> The determination of mental RFC involves the consideration of evidence, such as:
>
> History, findings, and observations from medical sources (including psychological test results), regarding the presence, frequency, and intensity of hallucinations, delusions or paranoid tendencies; depression or elation; confusion or disorientation; conversion symptoms or phobias; psychophysiological symptoms; withdrawn or bizarre behavior; anxiety or tension.
>
> When a case involves an individual . . . who has a severe impairment(s), which does not meet or equal the criteria in the Listing of Impairments, the individual's RFC must be considered in conjunction with the individual's age, education, and work experience. While some individuals will have a significant restriction of the ability to perform some work-related activities, not all such activities will be precluded by the mental impairment. However, all limits on work-related activities resulting from the mental impairment must be described in the mental RFC assessment.

SSR 85-16, Policy Interpretation Ruling Titles II and XVI: Residual Functional Capacity for Mental Impairments, 1985 WL 56855, *2 (S.S.A. 1985).

Here, at step two of the sequential analysis, the ALJ found that plaintiff had "borderline intellectual functioning with reading disorder". T. 13. Dennis Noia, Ph.D. conducted a consultative "Intelligence Evaluation" and concluded that plaintiff was functioning in the borderline range of intelligence and had a reading disorder. T. 200. Dr. Noia concluded that vocationally, plaintiff appeared capable of: understanding and following simple instructions and

16

directions; performing simple, and some complex, tasks; maintaining attention and concentration; regularly attending to a routine; maintaining a schedule; learning new tasks; making appropriate decisions; dealing with stress; and interacting "moderately well" with others.  T. 201.

A non-examining psychologist, E. Kamin, completed a "psychiatric review" and found plaintiff's "Impairment(s) Not Severe".  T. 217.  Kamin noted:

> The clmt is a 45 year old male who alleges disability due to a learning disability and inability to read and write.  The clmt has a history of having dropped out of school in the 9th grade, and then receiving his GED. [Testing] revealed scores indicative of borderline intellectual functioning and therefore his impairment is felt to be non-severe.

T. 229.

Here, the ALJ acknowledged the applicable Regulations and his duty in formulating the RFC stating:

> The limitations identified in the "paragraph B" and "paragraph C" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process.  The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p).  Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.  T. 16.

The ALJ summarized Dr. Noia's opinion and noted Kamin's opinion.  The ALJ afforded "great weight" to Dr. Noia's opinion "because of his programmatic expertise and findings that are consistent with the record".  T. 18.  The ALJ gave "[s]ome weight to the non-examining review psychologist because the claimant's borderline intellectual functioning poses a minimal limitation on the claimant's ability to perform basic mental activities of work."  T. 18.  Plaintiff does not

17

contest that determination and based upon the record, the Court finds that the ALJ assigned proper weight to those opinions.  Plaintiff argues that the ALJ failed to address Dr. Noia's finding that plaintiff's reading and writing abilities were "significantly below an age appropriate level". The ALJ, however, specifically noted that Dr. Noia found that plaintiff had a reading disorder, T. 16, but found that plaintiff's mental limitations would not "prevent the claimant from engaging in simple, competitive work on a continuing and sustained basis."  T. 19.  Thus, plaintiff's argument is without merit.

The ALJ discussed plaintiff's treatment history, his age, education and work experience in compliance with SSR 85-16.  Plaintiff presents nothing more than vague, conclusory objections to the ALJ's determination.  Moreover, the ALJ's reliance on Dr. Noia's opinion was proper.  The doctor's conclusions are not contradicted by any evidence in the record.  *See Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983) ("In assessing opinions, a written report by a licensed physician who has examined plaintiff may constitute substantial evidence supportive of a finding by the hearing examiner"); *see also Diaz v. Shalala*, 59 F.3d 307, 313, n. 5 (2d Cir. 1995) (an ALJ may rely upon the opinions of the state agency consultants when the evidence in the record supports the conclusions).

The Court finds that the ALJ properly assessed plaintiff's mental impairments and determined that his intellectual functioning and reading disorder did not "significantly erode the sedentary occupational base."  T. 19.  Accordingly, the Court concludes that plaintiff's contention that the ALJ failed to include plaintiff's mental limitations in the residual functional capacity is without merit.

### D.      Treating Physician

Plaintiff argues that the ALJ erred in failing to accord controlling weight to the opinion of Dr. Walsh, plaintiff's treating physician.  Plaintiff's objection to the Magistrate Judge's analysis of the ALJ's consideration of Dr. Walsh's opinion is that the Magistrate Judge "permits reliance upon a one-time consultative examiner's opinions over that of the treating physicians [sic]".  Plaintiff also argues that the absence of an MRI report is an impermissible ground upon which to discount a treating physician's opinion because it is the ALJ's duty to fill any gaps in the medical record.

An ALJ must affirmatively develop the record in light of the "essentially non-adversarial nature of a benefits proceeding", even if the claimant is represented by counsel.  *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) (quoting *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)); *see also Echevarria v. Secretary of Health and Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982).  The duty of an ALJ to develop the record is "particularly important" when obtaining information from a claimant's treating physician due to the "treating physician" provisions in the regulations.[1] *Devora v. Barnhart*, 205 F.Supp.2d 164, 172 (S.D.N.Y. 2002)*.* "There is ample case law suggesting that an ALJ has an independent duty to make reasonable efforts to obtain a report prepared by a claimant's treating physician in order to afford the claimant a full and fair hearing." *Devora*, 205 F.Supp. 2d at 174 (collecting cases).  This obligation includes obtaining the treating physicians' assessments of plaintiff's functional capacity.  20 C.F.R. § 404.1512(e); *see also Hardhardt v. Astrue*, No. 05-CV-2229, 2008 WL 2244995, at *9 (E.D.N.Y. May 29, 2008).

---

[1] Under the regulations, a treating source's opinion is entitled to controlling weight if well-supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with other substantial evidence in the record.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

The Regulations state, in relevant part: "Before we make a determination that you are not disabled, we will develop your complete medical history ... [and] will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports." *Pabon v. Barnhart*, 273 F.Supp.2d 506, 517 (S.D.N.Y. 2003) (citing 20 C.F.R. § 416.912(d)); *see also Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996).   Remand is necessary if the ALJ fails to attempt to contact the plaintiff's treating physician to properly determine her RFC. *See Rosa v. Apfel*, No. 97 Civ. 5831, 1998 WL 437172, at *4 (S.D.N.Y. Jul. 31, 1998); *see also Hopper v. Comm'r of Social Sec.*, 7:06-cv0038, 2008 WL 724228, at *11 (N.D.N.Y. Mar. 17, 2008); *see also Oliveras ex rel. Gonzalez v. Astrue*, No. 07 Civ. 2841, 2008 WL 2262618, at *6-7 (S.D.N.Y. May 30, 2008) (holding that remand is appropriate even where there is no guarantee that the outcome will change, so that the ALJ can make reasonable efforts to obtain the treating physicians opinion on functional capacity).

In the Disability Report, plaintiff indicated that he had an "MRI/CT Scan whole body" in February 2006 at Chenango Memorial Hospital.  T. 110.  Records from Chenango Memorial Hospital were requested and received.  T. 231.  According to a discharge summary from Chenango Memorial Hospital dated February 11, 2006, a CT of the brain showed "[n]o acute change" and an x-ray of the lumbosacral spine showed "[n]o acute change."  T. 167; *see also* T. 173 (CT scan imaging services report); T. 174 (x-ray imaging services report). A report by Dr. Walsh regarding an office visit on February 18, 2008, refers to plaintiff's "long history of back pain" and notes that plaintiff indicated "he will bring in reports from previous imaging which he states delineates multi-level disc disease."  T. 339.  In a report dated October 8, 2008, Dr. Walsh refers to an "MRI completed several years ago" and that the report "shows herniation at L5-S1."

T. 298.

When evaluating Dr. Walsh's opinion, the ALJ referred to Dr. Walsh's June 2008 opinion, in which "Dr. Walsh indicated the claimant could stand and/or walk two hours a day and sit less than six hours a day because his lumbar radiculopathy made sitting for long periods painful". T. 17. The ALJ, however, discounted Dr. Walsh's opinion regarding plaintiff's ability to sit and stand because Dr. Walsh "had just diagnosed lumbar radiculopathy on that date based on the claimant's subjective complaint with little clinical and no laboratory findings." T.17.

On October 8, 2008, Dr. Walsh completed a medical examination form in which he opined that plaintiff's ability to walk, stand, and sit was "severely limited (1-2 hours)". T. 304. Plaintiff saw Dr. Walsh that same day. T. 298. In his notes from that visit, Dr. Walsh indicated that according to a report from an MRI completed "several years ago" plaintiff had "herniation at L5-S1." T. 298. Thus, unlike his June 2008 opinion, Dr. Walsh's October 8, 2008 opinion may be based on acceptable medical imaging, i.e., an MRI. The ALJ, however, did not address Dr. Walsh's October 8, 2008 opinion. "In light of the ALJ's affirmative duty to develop the administrative record, 'an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.'" *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999)). The ALJ, therefore, should have attempted to obtain the MRI report Dr. Walsh referred to in his October 8, 2008, office note before discounting Dr. Walsh's opinion. Accordingly, this matter is remanded for further development of the medical record and reconsideration of Dr. Walsh's opinion. The ALJ is also directed to reconsider plaintiff's credibility on remand.

### E.    Vocational Expert

21

Plaintiff argues that the ALJ should have consulted a vocational expert at step five of the evaluation to determine whether, despite plaintiff's borderline intellectual functioning and reading disorder, there were jobs in the economy that plaintiff would perform.  "[T]he mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines."  *Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986).  "A more appropriate approach is that when a claimant's nonexertional impairments significantly diminish his ability to work—over and above any incapacity caused solely from exertional limitations—so that he is unable to perform the full range of employment indicated by the medical vocational guidelines, then the Secretary must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform."  *Id*.  Having already concluded that the ALJ properly considered the evidence regarding plaintiff's mental limitations and found they posed " a minimal limitation on the claimant's ability to perform basic mental activities or work", there is no basis for finding that a vocational expert was required in this case.[2]

**VI.   CONCLUSION**

For the foregoing reasons, it is hereby

**ORDERED** that the Report-Recommendation is rejected with respect to the treating physician rule and credibility; and it is further

---

[2]Plaintiff also, though conclusorily, takes issue with the ALJ's failure to consult a vocational expert regarding several non-exertional limitations Dr. Walsh identified in his opinion, i.e., twisting, stooping, climbing, fatigue, and pain.  In light of the Court's remand of this matter for further development of the record and reconsideration of Dr. Walsh's opinion, the ALJ may wish to reconsider the impact of the non-exertional limitations identified by Dr. Walsh on plaintiff's ability to perform a full range of sedentary work, and whether a vocational expert is necessary.

**ORDERED** that the Report-Recommendation is otherwise accepted in its entirety; and it is further

**ORDERED** that this matter is remanded to the Commissioner of Social Security for further development of the record and reconsideration of the treating physician rule, plaintiff's credibility, and any issues that arise as a result of the reconsideration of those issues; and it is further

**ORDERED** that judgment be entered for plaintiff; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

Date:   July 17, 2012

Honorable Norman A. Mordue
U.S. District Judge

23